IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| Steven Michael Cabrera, | ) | No. CIV 08-1180-PHX-GMS (DKD) |
| Petitioner, | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| Deputy Warden Bock, et al., | ) | |
| Respondents. | ) | |

TO THE HONORABLE G. MURRAY SNOW, UNITED STATES DISTRICT JUDGE:

Steven Michael Cabrera filed a petition for writ of habeas corpus, challenging his convictions in Maricopa County Superior Court for attempted second degree murder, kidnapping, and sexual assault and the imposition of consecutive terms totaling 63 years. He raises four grounds for habeas relief. In the first three grounds, he argues constitutional violations related to the imposition of consecutive sentences. He alleges (1) that the trial court allowed the allegation of rape to enhance his sentence without evidence; (2) that the trial court "double counted" the separate aggravating circumstances of financial and emotional harm to the victim; and (3) that the trial court improperly bootstrapped the aggravating circumstance of emotional harm to the victim. In his fourth ground, he argues trial counsel was ineffective by failing to object to certain allegations, failing to adequately present mitigating evidence, and failing to adequately cross-examine the victim. Because the Court agrees with Respondents that the grounds are unexhausted, it recommends that the petition be denied and dismissed with prejudice.

# BACKGROUND

The facts surrounding the convictions are summarized in the court of appeals memorandum decision:

> F testified at trial that, around 7:00 a.m. on the morning of Saturday, December 13, 2003, her husband left their apartment in Chandler and went to work. Shortly before 10:00 a.m., F's mother and sister and the sister's father arrived at the apartment to collect F's two little girls. They stayed with F fifteen or twenty minutes before leaving with F's children.
>
> Five minutes after they left, Defendant knocked at F's door and explained th[at] he was a maintenance person sent from the apartment complex office to check a malfunctioning garbage disposal. F thought this was odd, as there was nothing wrong with her disposal, but she permitted Defendant to enter the apartment. Defendant went directly to the sink in the kitchen and opened the cabinet to look at the disposal. He informed F that her husband had called and reported that the disposal was broken, however F assured him that "it was working now."
>
> After trying the disposal, Defendant asked her if there was anything else that was broken in her apartment. F took him to her bedroom where she showed him a vane that had broken off of one of the window blinds in that room. Defendant took the broken vane to look at it, and told F they could fix it. He then asked to see the blinds in the other rooms. He and F went to the living room and then to F's daughters' room.
>
> Defendant told F that he was "exhausted" from going from apartment to apartment, checking on things, and asked her for a glass of water. F went to the kitchen and filled a plastic cup with ice water. Defendant drank the water and placed the cup down on the dining room table. He told F that he could have her carpet replaced and looked at a non-functioning fire detector whose batteries had died. Defendant then returned to the kitchen to look at the garbage disposal.
>
> Throughout this time, Defendant repeatedly asked F what time her husband would be home. F testified that his questions did not concern her as Defendant "seem[ed] nice." Defendant then asked F what her work schedule was like because the "new rule" was that someone had to be in the apartment before maintenance could enter to make repairs.
>
> With defendant still on his knees checking the disposal, F entered the kitchen and crossed to the refrigerator where her schedule was posted. As she stood there, Defendant came up behind her. He placed his left hand on her neck, and, with his right hand, held a "yellow orange" box cutter with a razor blade to the right side of her neck. He told her to "be quiet or he would kill [her]." With his left hand Defendant then "started grabbing [her] breast" and her "private parts" over her clothes. Defendant next "put" F on the floor, took her shoes, and kept "grabbing [her] breasts."
>
> At some point, Defendant told F to get up and took her into her daughters' bedroom. All the while, Defendant kept telling F to "be quiet or he

was going to kill [her]." He told her that "he just wanted to have sex, and. . . once he was done, he was going to leave, and he didn't want [her] to call the police."

F kept asking him not to do anything to her; she offered to give him her ATM card with her PIN number if he would leave her alone. But Defendant kept "grabbing" her breasts, and she realized that Defendant's "pants were down" because she could feel Defendant "rubbing his private parts behind her." Defendant next put his fingers inside F's vagina.

After that, Defendant got a pillow case from one of the beds and tied it around F's mouth and head. He also took her daughter's pink purse and used it to tie F's hands. F was lying on her stomach, "trying not to look at [Defendant] or do anything to move" because she did not want Defendant to kill her.

Once Defendant had tied her hands and placed the pillow case around her mouth, he then moved F again and placed her face down, on top of her daughter's bed. He told her he was going to tie her legs so that she would not be able to get up and call police. Defendant was on F's back at that point and she saw "that he got a cord" in his hands, which F recognized as a blue strap from another one of her daughter's purses. Suddenly, Defendant informed her that, instead of tying her legs, "he was going to do this," and he began strangling her. F tried to get her fingers between the rope and her neck, but she could no longer breathe and "started seeing white."

When she regained consciousness, she found herself on the floor between the bed and the crib in her daughters' room. She could not breathe and felt "something hot" going through her body. When she was able to get up and saw her face in a mirror, she saw blood on her face and neck.

F locked the front door and tried to find her cell phone or kitchen phone to call 911, but both were gone. She then tried the telephone in her bedroom, but the line was dead. At that point, she made her way to her next-door neighbor's apartment, and pounded on the door, saying, "I'm dying. Please help me. Someone raped me." Her neighbor did not recognize her at first, but eventually he let her in and called 911.

Paramedics at the scene located "at least 10 stab wounds" on F. F was taken by helicopter to Scottsdale Osborn Hospital where she was treated as a "level one trauma" patient for multiple injuries, including multiple stab wounds and lacerations to her neck, thigh, flank and abdomen. Surgeons repaired a hole in her diaphragm and the lower lobe of the left lung, as well as injuries to her liver and to her left kidney.

On the day of the crime, police searched for a knife or other "sharp-edged weapon" in F's apartment and on the grounds of the apartment complex, but found none. Their investigative efforts were stymied by the fact that, due to her injuries, they were unable to speak with the victim until the day after the attack. However, on December 14, F identified her assailant as a "Hispanic or white male" with a moustache. She also informed police that he had touched the vane of her blind and drunk from a plastic cup. Police later located both items in her apartment.

A latent print lifted from the blind vane led to the identification of Defendant. Police contacted him on December 16 at his apartment complex in Gilbert and served him with an Order of Physical Characteristics. Defendant cooperated with officers and went to the Chandler Police Department where a nurse took samples of his head and pubic hairs and swabbed his mouth and penis for DNA testing. Defendant was also photographed and fingerprinted.

That same day, police constructed a photo-lineup that included Defendant's photo and showed it to the victim at the hospital. "Two seconds" after looking at it, F pointed to Defendant's photograph and told the officers "That's him . . . .that looks just like him, only he's not wearing the sweater."

A detective interviewed Defendant on December 16, and a videotape of the interview was played for the jurors at trial. Defendant told the detective that he had spent the morning of the 13th at work and had then returned home and spent the remainder of the day with his fiancee, Norma, and their son. He denied any knowledge of or familiarity with the victim's apartment complex.

* * *

Defendant testified at trial and told several differing versions of how he spent the morning of December 13. He admitted initially lying to the police and to his fiancee about being at work, but maintained that he "drove by" his workplace because he was trying to contact an individual to whom he owed money.

He also admitted being at F's apartment that morning. According to Defendant, he initially met F in August or September of 2003 when he "literally bumped into her" at a Target across the street from her apartment complex. They had a brief exchange when he apologized to her. Then, a few weeks later, he "bumped into her" again at a QT near her apartment and had a brief conversation where they "exchanged names" for the first time. According to Defendant, he had been "kind of flirtatious" with her. Sometime in November, he ran into her again at a Food City, and they exchanged telephone numbers. A day or two later, they spoke on the phone, and thereafter spoke on the phone "between three and 10 times."

Eventually F invited Defendant to her apartment and confided that she was "having problems with her husband." He had been there only twice. Although he and F had never had sexual relations, according to Defendant "it was leading in that direction."

On the Friday before the assault, F called Defendant and asked him to stop by. Defendant went there Saturday morning to tell her that his "girlfriend was getting real suspicious" that he was cheating on her and that he "thought it was best to stop before we got caught." F agreed "because her husband was also getting suspicious." He drank some water and looked at her broken blind. He stayed at the apartment only ten minutes and left before 10:00 a.m.

On cross-examination, the prosecutor asked Defendant why he had told the police that he was not familiar with the apartment complex when he had visited F there twice and his fiancee's brother also lived there at the time.

> Defendant explained that the address the police had given him "didn't sound familiar" and that he did not realize it was that apartment. Despite the seriousness of the charges, he had not believed it was relevant to tell the police what had transpired between him and F.

(Doc. #12, Exh A: P.I., Item 131, memorandum decision at 2-9).

Following the jury verdicts on the underlying offenses, the jury also found that the State had proven beyond a reasonable doubt the aggravating circumstances of financial and emotional harm to the victim (*Id.*, Exh H at 38-39). The State argued for three maximum consecutive terms. The State also informed the trial court that it had decided not to offer a plea agreement because the victim wanted Cabrera to be punished for every criminal act that he had committed against her, and because the State had learned of a report that Cabrera previously bound and raped a young girl in California (*Id.*, Exh I at 14-15). Prior to the imposition of sentence, the trial court stated on the record that it had not considered the statements made by the prosecutor regarding the rape allegation in California (*Id.*, Exh I at 25). On direct review, Cabrera argued three issues: (1) his kidnapping conviction must be vacated because the charge was duplicitous and thus resulted in a guilty verdict that was not unanimous; (2) the imposition of consecutive prison terms violated Arizona's double punishment statutes, and the Double Jeopardy Clause of the United States Constitution and Article II, Section 10 of the Arizona Constitution; and (3) the trial court abused its discretion when it admitted testimony from Cabrera's mistress about his whereabouts on the day of the assault (*Id.*, Exh J at 9-23). The court of appeals affirmed Cabrera's convictions and sentences in a memorandum decision issued on October 20, 2005 (*Id.*, Exh A: P.I. Item 131).

On December 1, 2005, Cabrera filed a Notice of Post-Conviction Relief (*Id.*, Item 128). Through counsel, he raised the following claims: (1) the sentences were imposed in violation of the Sixth Amendment to the United States Constitution and Article II, Section 24 of the Arizona Constitution when the trial court double-counted the aggravating circumstances and because the emotion harm aggravating factor was improper bootstrapping as an element of the jury's dangerousness finding; and (2) trial and appellate counsel

rendered ineffective assistance for failing the raise these issues (*Id.*, Item 148 at 4-8). On October 6, 2006, the trial court summarily denied the Rule 32 petition because Cabrera had failed to raise a colorable claim for post-conviction relief (*Id.*, Exh B: M.E., Item 156). On October 31, 2006, Cabrera filed a pro per petition for review in the court of appeals, raising the following issues for review:

  (1) Was Appellant (sic) attorney ineffective assistance of counsel;

  (2) Can ineffective assistance claims be brought on collateral attack;

  (3) Does appellant's sentence violates (sic) his Sixth Amendment rights;

  (4) Did the State violates (sic) Appellant's constitution in double counting of aggravating factors in his case;

  (5) Did the State commit improper bootstrapping of aggravating factor; and

  (6) Is Appellant precluded from setting forth his arguments in his Rule 32 petition.

(*Id.*, Exh L at 2).

Following the State's response, Cabrera filed a reply, raising several new grounds:

  (1) The trial court "abused its discretion when it allowed the allegation of a rape, supposedly defendant had been convicted of in California," because Petitioner had never been convicted of "rape in California," and a jury should have found this fact;

  (2) The trial court harbored judicial bias against Petitioner, as manifested by its remarks before imposing three consecutive 21-year prison terms exceeding Petitioner's life expectancy;

  (3) Trial counsel rendered ineffective assistance because of his "failure to have witnesses and evidences (sic) to determine competency and diminished capacity of defendant's (sic) in this case;"

  (4) Due process required the trial court to appoint him a psychiatric expert;

  (5) The trial court incorrectly believed that Petitioner committed perjury when he testified at trial; and

|   |   |
|---|---|
| 1 | (6) The multiplicitous nature of Petitioner's charges violated the Fifth Amendment Double Jeopardy Clause (*Id.*, Exh N at 2-5). |

On August 23, 2007, the court of appeals summarily denied review (*Id.*, Exh O). On September 13, 2007, Cabrera filed a petition for review in the Arizona Supreme Court, presenting the following claims for the first time:

>   (1) Trial counsel rendered ineffective assistance because of the following acts or omissions: (a) counsel "failed to defend appellant against perjury information presented at his trial;" (b) counsel did not challenge the trial court's "decision to allow the allegation of rape" from California at sentencing and at some unspecified time at trial; (c) counsel failed to call unnamed witnesses and present unspecified evidence to counter the State's case; (d) counsel failed to "investigate, develop, and present" mitigating evidence, including evidence of Petitioner's psychiatric history; (e) counsel failed to subject the State's case to meaningful "adversarial" challenge by aggressively cross-examining the victim and impeaching her with an unidentified and speculative felony conviction; (f) counsel presented no mitigating evidence or argument on Petitioner's behalf at sentencing;
>
>   (2) The trial court violated the Eighth Amendment because he "expressed his own personal opinions, manifesting a bias that resulted in the imposition of consecutive sentences exceeding Petitioner's life expectancy;
>
>   (3) The State's decision to charge "a single offense in several counts" violated the double Jeopardy Clause.

(*Id.*, Exh P).

On December 17, 2007, the supreme court summarily denied review (*Id.*, Exh Q).

## EXHAUSTION OF REMEDIES

A state prisoner must exhaust his state remedies before petitioning for a writ of habeas corpus in federal court. 28 U.S.C. § 2254(b)(1) & (c); *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *McQueary v. Blodgett*, 924 F.2d 829, 833 (9th Cir. 1991). To properly exhaust state remedies, a petitioner must fairly present his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 839-846 (1999). In Arizona, a petitioner must fairly present his claims to the Arizona Court of Appeals by properly pursuing them through the state's direct appeal process or through appropriate post-conviction relief. *Swoopes v. Sublett*, 196 F.3d 1008, 1010 (9th Cir. 1999); *Roettgen v. Copeland*, 33 F.3d 36, 38 (9th Cir. 1994). A claim has been fairly presented if the petitioner

has described both the operative facts and the federal legal theory on which the claim is based. *Bland v. Cal. Dep't of Corrections*, 20 F.3d 1469, 1472-73 (9th Cir.1994), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017, 1025 (9th Cir. 2000) (en banc); *Tamalini v. Stewart*, 249 F.3d 895, 898-99 (9th Cir. 2001). The exhaustion requirement will not be met where the Petitioner fails to fairly present his claims. *Roettgen*, 33 F.3d at 38.

If a petition contains claims that were never fairly presented in state court, the federal court must determine whether state remedies remain available to the petitioner. *See Rose v. Lundy*, 455 U.S. 509, 519-20 (1982); *Harris v. Reed*, 489 U.S. 255, 268-270 (1989) (O'Connor, J., concurring). If remedies are available in state court, then the federal court may dismiss the petition without prejudice pending the exhaustion of state remedies. *Id.* However, if the court finds that the petitioner would have no state remedy were he to return to the state court, then his claims are considered procedurally defaulted. *Teague v. Lane*, 489 U.S. 288, 298-99 (1989); *White v. Lewis*, 874 F.2d 599, 602-605 (9th Cir. 1989). The federal court may decline to consider these claims unless the petitioner can demonstrate that a miscarriage of justice would result, or establish cause for his noncompliance and actual prejudice. *See Schlup v. Delo*, 513 U.S. 298, 321 (1995); *Coleman v. Thompson*, 501 U.S. 722, 750-51 (1991); *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986); *Wainwright v. Sykes*, 433 U.S. 72, 86 (1977); *United States v. Frady*, 456 U.S. 152, 167-68 (1982).

Further, a procedural default may occur when a Petitioner raises a claim in state court, but the state court finds the claim to be defaulted on procedural grounds. *Coleman*, 501 U.S. at 730-31. In such cases, federal habeas review is precluded if the state court opinion contains a plain statement clearly and expressly relying on a procedural ground "that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision." *See Harris*, 489 U.S. at 260. A state procedural default ruling is "independent" unless application of the bar depends on an antecedent ruling on the merits of the federal claim. *See Ake v. Oklahoma*, 470 U.S. 68, 74-75 (1985); *Stewart v. Smith*, 536 U.S. 856 (2002). A state's application of the bar is "adequate" if it is "'strictly or regularly followed.'"

*Johnson v. Mississippi*, 486 U.S. 578, 587 (1988) (quoting *Hathorn v. Lovorn*, 457 U.S. 255, 262-63 (1982)). In cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, just as in cases involving defaulted claims that were not fairly presented, federal habeas review of the claims is barred unless the prisoner can demonstrate a miscarriage of justice or cause and actual prejudice to excuse the default. *See Coleman*, 501 U.S. at 750-51.

**DISCUSSION**

In his first ground, Cabrera contends that the prosecutor's allegation that Cabrera had raped another woman in California violated both his federal and state constitutional rights. In his fourth ground, he raises three claims of ineffective assistance of counsel: (1) trial counsel failed to object and argue against the rape allegation; (2) trial counsel failed to "investigate, develop, and present mitigating evidence;" and (3) trial counsel did not aggressively cross-examine the victim, including impeachment with felony convictions. Cabrera did not present any of these grounds to the trial court in his petition for post-conviction relief. They were presented for the first time in either the Arizona Court of Appeals or the Arizona Supreme Court on discretionary review. That does not constitute "fair presentation" for purposes of exhaustion. *Roettgen*, 33 F.3d at 38. In addition, the claims are procedurally defaulted because Cabrera would have no remedy, were he to return to state court. *Teague*, 489 U.S. at 298-99.

In his third ground, Cabrera contends that aggravated sentences were imposed in violation of his eighth amendment rights because the trial court considered the bootstrapped aggravating circumstance of emotional harm to the victim. He argues that the emotional harm suffered by the victim was inextricably intertwined with the elements necessary to establish dangerousness. However, his legal theory differed in state court. During his Rule 32 proceedings, he argued that the alleged bootstrapping resulted in a sentence imposed in violation of his sixth amendment rights. He also argued that state law prohibited the trial court from aggravating his sentence with the emotional-harm factor because a fact

constituting a necessary element of the offense cannot later be used to aggravate the sentence, absent the state's proof that a defendant engaged in conduct exceeding the elements or aggravating the circumstances. A fair presentation of the claim in state court requires the use of the *same federal* legal theory; a different federal theory will not suffice. *See Rose v. Palmateer*, 395 F.3d 1108, 1111-12 (9th Cir. 2005). In addition, his reliance on a claimed violation of state law will not be re-examined by a federal court in a habeas proceeding. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Finally, the claim is procedurally defaulted because a return to state court would be futile. *Teague*.

In his second ground, Cabrera contends that the trial court violated his eighth amendment right to be free from cruel and unusual punishment by double counting the aggravating circumstances of financial and emotional harm to the victim. Respondents argue that this ground was not fairly presented or properly exhausted because Cabrera raised the claim in both the Rule 32 petition and in his petition for review as a *sixth* amendment violation. In order to properly exhaust a federal claim, a state prisoner must refer "to a specific federal constitutional guarantee." *See Gray v. Netherland*, 518 U.S. 152, 162-63 (1996). Cabrera was required to put the state courts on notice that he was seeking to vindicate this particular federal right. *Duncan*, 513 U.S. at 365. Part of this requirement is that a state prisoner present the state courts with the same claim he argues in federal court, thus giving state courts the first opportunity to respond. *See Picard v. Connor*, 404 U.S. 270, 275-76 (1971). Cabrera's explicit reference to a different constitutional amendment in his federal petition does not meet the exhaustion requirements.[1]

---

[1] Cabrera cites *Unites States v. McCullah*, 76 F.3d 1087, 1111 (10th Cir. 1996), in his Rule 32 and his petition for review for the proposition that "[d]ouble counting of aggravating factors, especially under a weighing scheme such as Arizona's non-capital statutes, has a tendency to skew the weighing process and creates the risk that the ultimate sentence will be arbitrarily and thus, unconstitutionally imposed." *See* Doc. #15, Exh A: P.I. Item 148 at 5. In addition to the fact that he did not cite the eighth amendment in his state court proceedings, this oblique reference to a constitutional violation would not alert the state court to any eighth amendment claim. *See Jackson v. Coalter*, 337 F.3d 74, 86 (1st Cir. 2003).

Finally, Cabrera has not shown cause for his procedural defaults. Any action by post-conviction counsel cannot be a basis for cause because there is no constitutional right to counsel in post-conviction proceedings. *Coleman*, 501 U.S. at 752-53. In addition, he cannot establish cause based on his pro per status and incarceration. *Kibler v. Walters*, 220 F.3d 1151, 1153 (9th Cir. 2000).

**IT IS THEREFORE RECOMMENDED** that Steven Michael Cabrera's petition for writ of habeas corpus be **denied** and **dismissed with prejudice** (Doc. #1).

**IT IS FURTHER RECOMMENDED** that a Certificate of Appealability and leave to proceed *in forma pauperis* on appeal be **denied** because dismissal of the Petition is justified by a plain procedural bar and jurists of reason would not find the ruling debatable.

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals. Any notice of appeal pursuant to Rule 4(a)(1), Federal Rules of Appellate Procedure, should not be filed until entry of the district court's judgment. The parties shall have fourteen days from the date of service of a copy of this recommendation within which to file specific written objections with the Court. *See*, 28 U.S.C. § 636(b)(1); Rules 72, 6(a), 6(b), Federal Rules of Civil Procedure. Thereafter, the parties have fourteen days within which to file a response to the objections. Failure timely to file objections to the Magistrate Judge's Report and Recommendation may result in the acceptance of the Report and Recommendation by the district court without further review. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003). Failure timely to file objections to any factual determinations of the Magistrate Judge will be considered a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the Magistrate Judge's recommendation. *See* Rule 72, Federal Rules of Civil Procedure.

DATED this 6th day of April, 2010.

_____
David K. Duncan
United States Magistrate Judge